**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 08-1917**

MERCK & COMPANY, INCORPORATED,

Plaintiff – Appellee,

v.

INTERNATIONAL CHEMICAL WORKERS UNION COUNCIL OF THE UNITED
FOOD AND COMMERCIAL WORKERS UNION, LOCAL 94C,

Defendant – Appellant.

Appeal from the United States District Court for the Western
District of Virginia, at Harrisonburg.   Samuel  G.  Wilson,
District Judge.  (5:07-cv-00114-SGW)

Argued: March 25, 2009                Decided: July 6, 2009

Before MICHAEL, KING, and AGEE, Circuit Judges.

Reversed and remanded by unpublished per curiam opinion.

**ARGUED**:  Jonathan G. Axelrod, BEINS & AXELROD, PC, Washington,
D.C., for Appellant.  Joseph Edward Santucci, Jr., MORGAN, LEWIS
& BOCKIUS, LLP, Washington, D.C., for Appellee.  **ON BRIEF**:
Heather S. Gelfuso, MORGAN, LEWIS & BOCKIUS, LLP, Washington,
D.C., for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

The International Chemical Workers Union Council of the United Food and Commercial Workers Union, Local 94C (the "Union"), appeals from the district court's adverse decision of August 12, 2008, awarding summary judgment to Merck & Company, Incorporated ("Merck"), and vacating an arbitration award in favor of the Union. See Merck & Co., Inc., v. Int'l Chem. Workers Union Council of the United Food and Commercial Workers Union, Local 94C, No. 5:07-cv-00114 (W.D. Va. Aug. 12, 2008) (the "Memorandum Opinion").[1] The court ruled that the arbitrator had exceeded his authority in making the arbitration award, which required Merck to reinstate one of its employees. As explained below, we reverse and remand for enforcement of the award.

I.

A.

On September 7, 2005, Dale Moubray reported to work at Merck's Elkton, Virginia, facility under the influence of alcohol. Moubray, a pipe-fitter/millwright, is represented by the Union, which is the exclusive collective bargaining

---

[1] The Memorandum Opinion is found at J.A. 151-56. (Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.)

representative for a bargaining unit of production and maintenance employees at Merck's Elkton facility.[2] Rather than terminate Moubray from his employment, Merck imposed a five-day unpaid disciplinary suspension. Following the suspension, on September 13, 2005, Merck, Moubray, and a Union representative entered into a "Return to Work & Last Chance Agreement" (the "Last Chance Agreement" or the "LCA"). See J.A. 58-59.

The Last Chance Agreement required Moubray to, inter alia, meet with a representative of Merck's Employee Assistance Plan in order to establish a treatment plan. The LCA further obliged Moubray "to comply with all recommendations and requirements as established by the Employee Assistance Plan and the Health Services Department." J.A. 58. If, at any time, Moubray failed to comply with these recommendations and requirements, the LCA provided that he would "be subject to immediate termination and such termination [would] not be subject to the contractual grievance and arbitration procedures." Id. at 59.[3] The LCA stated, however, "that in the event of a termination, Mr. Moubray may file a grievance challenging the facts upon which

---

[2] Merck and the Union were signatories to a collective bargaining agreement in effect from May 1, 2003, through April 30, 2006 (the "CBA"). See J.A. 1-49.

[3] The CBA created a governing grievance procedure that included arbitration of certain disputes. See J.A. 38-39.

3

the Company determined that Mr. Moubray was non-compliant or otherwise in violation of this Agreement." Id.

On the following day, September 14, 2005, Martha Sheridan, a representative of Merck's employee assistance program, met with Moubray and decided that he was to participate in a program offered by an independent entity called the LIFE Recovery Program (the "Program"). At his first session in the Program, on September 19, 2005, Moubray executed a patient contract (the "Program Contract"), agreeing to the following relevant conditions:

> 1. I will attend the LIFE Recovery Program . . . Monday, Tuesday, Thursday . . . . If extraordinary circumstances prevent my attendance or results in tardiness, I will notify the staff immediately.
>
> . . .
>
> 7. I will follow all relevant patient rules and regulations as stated in patient handbook.[4]
>
> . . .
>
> 11. I understand that the following behaviors may result in premature discharge from the program:
>
> . . .

---

[4] The "patient handbook" of the Program provides, in relevant part, that "[p]rompt attendance at all scheduled groups and activities is expected except when excused by your counselor, doctor, or nurse. You are expected to participate in and attend all scheduled groups and activities." J.A. 63.

4

> 5. Lack of cooperation with program expectations
> to the extent of impeding progress (This includes
> chronic tardiness or absenteeism).

J.A. 62.

In the weeks following the Program's first session, Moubray attended ten of eleven sessions, with a single excused absence on September 22, 2005. He then missed a session on October 13, 2005, attended sessions on October 17, 2005 and October 24, 2005, and missed sessions on October 18 and October 25, 2005. Moubray did not, prior to any of the three missed sessions, notify the Program to explain his absence or request to be excused. Moubray returned for a session on October 27, 2005, and met with his Program case manager, Dee Michael. Michael advised him not to miss the October 31, 2005 session, even though Moubray requested to be excused from it to take his godson trick-or-treating. Despite Michael's warning, Moubray did not attend the October 31 session. Moubray returned for the session of November 1, 2005, and was advised that he could not continue with the Program until he met with Michael. Moubray called Michael on November 2, 2005, and scheduled an appointment for the following day. Also on November 2, Sheridan, Merck's employee assistance program representative, called Michael to check on Moubray's status in the Program. Michael summarized Moubray's participation, and on November 3, 2005, sent a confirming letter to Merck (the "Letter"). Michael's Letter

5

concluded: "As of today's date, Mr. Moubray is not in compliance with our program requirements." J.A. 69.

Upon Merck's receipt of the Letter, Sheridan instructed Moubray not to attend the November 3, 2005 meeting with Michael because he had been kicked out of the Program. That same day, Merck notified Moubray by letter that he was out of compliance with the Last Chance Agreement and was, therefore, being suspended from employment, with intent to discharge. On November 14, 2005, Moubray was discharged by Merck.

B.

On November 15, 2005, the Union filed a grievance with Merck, protesting Moubray's discharge and seeking his reinstatement. Merck conducted a grievance hearing on December 16, 2005, and, that same day, denied the Union's grievance. The Union then submitted its grievance to arbitration before the Federal Mediation and Conciliation Service, on whether Moubray had complied with the terms of the Last Chance Agreement. On August 8, 2007, the parties participated in an arbitration hearing conducted by Arbitrator Jeffrey B. Tener (the "Arbitrator"). Two months later, on October 19, 2006, the Arbitrator entered an Arbitration Opinion and Award (the "Award"),[5] concluding that, although Merck was entitled to

_____

[5] The Award is found at J.A. 89-109.

6

terminate Moubray if he was out of compliance with the Last Chance Agreement, "[i]t cannot be concluded that Moubray was not compliant with the conditions of the last [chance] agreement so he was not subject to immediate termination." Award 20. The Award thus directed Merck to "reinstate [Moubray] to his former position and to make [him] whole." Id. When Merck refused to accept the Award and reinstate Moubray, this litigation ensued.

Two months later, on December 26, 2007, Merck filed its complaint in the Western District of Virginia, pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, seeking to vacate the Award. Merck alleged that the Arbitrator had ignored the plain language of the Last Chance Agreement and that the Award failed to draw its essence from the LCA. The Union disagreed, and counterclaimed for enforcement of the Award. On May 1, 2008, the parties filed cross-motions for summary judgment.

On August 12, 2008, the district court granted summary judgment to Merck and denied the Union's cross-motion. See Memorandum Opinion 1-2. In so ruling, the court recognized the narrow scope of judicial review for an arbitration award, but concluded that the Award must be vacated in any event because it "contradicts the express provisions of the last chance agreement." Id. at 5. The court observed that "Moubray plainly agreed to comply with 'all' treatment program 'requirements' and

7

recommendations, which unequivocally include punctual attendance. He also plainly agreed that he was subject to immediate termination if 'at any time' he became noncompliant." Id. The Memorandum Opinion observed that "[t]he agreement says absolutely nothing about expulsion or discharge from the program. Nor can the agreement be read to mean that Moubray is in compliance with all program requirements and recommendations so long as he has not been expelled." Id. at 5-6. Predicated on these observations, the court concluded that the Award "does not draw its essence from the last chance agreement" and must therefore be vacated. Id. at 6.

On August 18, 2008, the Union filed its timely notice of appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

We review de novo a district court's award of summary judgment. Volvo Trademark Holding Aktiebolaget v. Clark Machinery Co., 510 F.3d 474, 481 (4th Cir. 2007). Judicial review of an arbitration award in the collective bargaining context is "extremely limited," and "among the narrowest known to the law." Long John Silver's Rests., Inc. v. Cole, 514 F.3d 345, 349 (4th Cir. 2008) (internal quotation marks omitted). A reviewing court is entitled to "determine only whether the

8

arbitrator did his job — not whether he did it well, correctly, or reasonably, but simply whether he did it." Mountaineer Gas Co. v. Oil, Chem. & Atomic Workers Int'l Union, 76 F.3d 606, 608 (4th Cir. 1996). "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority," an arbitration award should be sustained, even if "a court is convinced he committed serious error." United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 38 (1987).

## III.

## A.

Under the deferential standard applicable here, an arbitration award must be sustained if it "draws its essence" from the parties' agreement. United Steelworkers of Am. v. Enter. Wheel & Car Corp., 363 U.S. 593, 597 (1960). An arbitration award draws its essence from the agreement so long as "[t]he arbitrator [does] not ignore the plain language of the contract." United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 38 (1987); Norfolk & W. Ry. Co. v. Transp. Commc'ns Int'l Union, 17 F.3d 696, 700 (4th Cir. 1994) (observing that "an award that ignores the plain and unambiguous language of the arbitration contract does not 'draw its essence' from the agreement"). Notwithstanding this deferential mandate, "[a]n

arbitrator does not have carte blanche . . . to 'dispense his own brand of industrial justice.'" U.S. Postal Serv. v. Am. Postal Workers Union, 204 F.3d 523, 527 (4th Cir. 2000) (quoting Enter. Wheel, 363 U.S. at 597). Rather, "an arbitrator is confined to interpretation and application of the parties' agreement." Id. (internal quotation marks omitted). In resolving a labor dispute, an arbitrator may be called upon to make factual findings or to interpret the applicable agreement. See Misco, Inc., 484 U.S. at 38. So long as an arbitrator does so within the confines of the controlling agreement and his interpretation of the agreement is not "wholly baseless and without reason," Norfolk & W. Ry. Co., 17 F.3d at 700, "the courts have no business overruling [an arbitrator] because their interpretation of the contract is different from [the arbitrator's]," U.S. Postal Serv., 204 F.3d at 527 (internal quotation marks omitted).

B.

In this proceeding, the parties agree that the underlying arbitration proceedings were governed by the discharge provisions of the Last Chance Agreement. Cf. Coca-Cola Bottling Co. v. Teamsters Local Union No. 688, 959 F.2d 1438, 1441 (8th Cir. 1992) (concluding that comparable last chance agreement superseded collective bargaining agreement). The LCA provided for Moubray's immediate termination — without recourse to the

grievance and arbitration procedures established in the CBA —— "[i]f at any time Mr. Moubray [became] non-compliant with the conditions of this Agreement." J.A. 59. The Union was authorized to dispute, however, "the facts upon which the Company determined that Mr. Moubray was non-compliant or otherwise in violation of this Agreement." Id. Pursuant to the LCA's authorization, the Union challenged and arbitrated the issue of whether Moubray had complied with the terms of the LCA. The parties do not dispute that the termination of Moubray was properly arbitrable. They also do not dispute the fact that the Arbitrator possessed authority to consider and make an award concerning the matter. Rather, Merck argues that the Award of reinstatement does not draw its essence from the LCA. Accordingly, the terms of the LCA, and the Arbitrator's view of those terms, are controlling here.

The Last Chance Agreement required that Moubray "comply with all recommendations and requirements as established by the Employee Assistance Plan and the Health Services Department." J.A. 58. In making the Award, however, the Arbitrator determined that "[t]here is no evidence that either the Plan or the [Health Services] Department established any requirements or had any recommendations other than those of the LIFE Recovery Program." Award 18. As such, the Award incorporated the requirements of the Program into the Last Chance Agreement,

11

concluding that "it is the requirements of that program which are controlling in this case." Id.

The Program, in turn, imposed attendance requirements on Moubray and specified conditions for his continued participation therein. Moubray was required to attend sessions three evenings per week and to notify staff if "extraordinary circumstances" prevented his attendance, and the patient handbook of the Program provided that "[p]rompt attendance at all scheduled groups and activities is expected except when excused by [a] counselor, doctor, or nurse." J.A. 62-63.

In making the Award, the Arbitrator agreed with these conditions, but nevertheless concluded that "the evidence still does not support the conclusion that Moubray was not in compliance with the program requirements." Award 19. Although the Program Contract specified that certain behavior — such as chronic absenteeism — "may result in premature discharge from the program," the Arbitrator explained in the Award that the evidence was "clear" that Moubray had not been discharged from the Program as of November 3, 2005. See id. The Award observed that the Letter, "upon which the Company relied so heavily and which states that 'As of today's date, Mr. Moubray is not in compliance with our program requirements'" also specified that Moubray "was told he would not be allowed back into the group until he first met with me." Id. (quoting J.A. 69). Thus,

12

although Michael concluded that Moubray was not in compliance with the Program's requirements, he had not been discharged from the Program. See id. Accordingly, the Award concluded that the "LIFE Recovery Program was not consistent," and, although it reported to Merck that Moubray was not in compliance with its requirements, Moubray had not been discharged from it.

Finally, the Arbitrator emphasized in the Award that "Moubray did not know or believe that he was not in compliance nor did he have any reason to suspect that he was not in compliance." Award 19. Importantly, the Arbitrator found that Moubray had credibly testified that he and the other participants in the Program had been advised that they could make up sessions if they missed them. See id. at 20. The Award explained that the evidence corroborated Moubray's testimony, in that he had not been discharged from the Program and had been permitted to make up earlier sessions that had been missed. Thus, the Award concluded, "it was reasonable for [Moubray] to believe that he was able to miss sessions and to make them up. . . . He had no reason to believe he was not in compliance with the requirements of the program." Id.

We agree with the district court that the Award considered Moubray's continued participation in the Program — or the absence of a discharge from the Program — to be synonymous with his compliance with the Program's requirements. We also agree

13

with the court that the Arbitrator relied, in part, on Moubray's subjective belief concerning his compliance with the Program requirements in concluding that Moubray had complied with the LCA. Notwithstanding these shortcomings, however, the Award must be sustained. See Misco, Inc., 484 U.S. at 38 (explaining that award should be sustained despite "serious error," so long as arbitrator "is even arguably construing or applying the contract and acting within the scope of his authority").

Although the terms of the LCA — requiring Moubray to "comply with all recommendations and requirements as established by the Employee Assistance Plan and the Health Services Department" — are plain and unambiguous, these terms alone are insufficient to resolve the issue presented to the Arbitrator. As the Award recognized, the Program established the only relevant recommendations and requirements, but applied them inconsistently. Thus, the Program required Moubray to unequivocally attend three weekly sessions, but statements of the Program staff contradicted this attendance requirement. And, although the Program established attendance requirements, it also provided for exceptions — such as an excuse by a counselor, doctor, or nurse. Importantly, the Program Contract itself specified the consequences of violating it. Rather than immediate expulsion for an unexcused absence, the Program Contract provided that "chronic tardiness or absenteeism" "may

14

result in premature discharge from the program." J.A. 62 (emphasis added). Although the district court concluded that this provision "unequivocally include[d] punctual attendance," Memorandum Opinion 5, such language provides sufficient flexibility to justify the Arbitrator's interpretation of it. Rather than "ignor[ing] the plain language of the contract," the Arbitrator confined himself "to interpretation and application of the parties' agreement," U.S. Postal Serv., 204 F.3d at 527, and we must defer to his interpretation of the Program's requirements.

In these circumstances, it was entirely plausible for the Arbitrator to conclude that Moubray was yet in compliance with the "requirements" of the Program. See Norfolk & W. Ry. Co., 17 F.3d at 700 (explaining that where arbitrator confines himself to plain language of contract, arbitration award should be confirmed unless "wholly baseless and completely without reason"). The Arbitrator interpreted the LCA by looking to and applying the requirements of the Program. He carefully examined the Program's documents and explained his view of what was required. Even if we were to disagree with the Arbitrator's interpretation and reasoning, we cannot conclude that his reasoning is wholly baseless or completely without reason. Put simply, we are entitled to "determine only whether the arbitrator did his job — not whether he did it well, correctly,

15

or reasonably, but simply whether he did it." Mountaineer Gas Co. v. Oil, Chem. & Atomic Workers Int'l Union, 76 F.3d 606, 608 (4th Cir. 1996). Accordingly, the Award "draws its essence" from the Last Chance Agreement and, as a result, we must reverse the ruling of the district court and direct enforcement of the Award.

IV.

Pursuant to the foregoing, we reverse the district court and remand for enforcement of the Award.

REVERSED AND REMANDED

16